## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 07-6388-SELTZER

UNITED STATES OF AMERICA,

      Plaintiff,

v.

TAVORIS BATTLE,

      Defendant.

_____/

## DETENTION ORDER

Pursuant to 18 U.S.C. § 3142(f), on December 28, 2007, a hearing was held to determine whether Defendant, Tavoris Battle, should be detained prior to trial. Having considered the factors enumerated in 18 U.S.C. § 3142(g), this Court finds that no condition or combination of conditions will reasonably assure the appearance of this defendant as required and/or the safety of any other person and the community. Therefore, it is hereby **ORDERED** that the defendant, Tavoris Battle, be detained prior to trial and until the conclusion thereof.

In accordance with the provisions of 18 U.S.C. § 3142(i), the Court hereby makes the following findings of fact and statement of reasons for the detention:

1. Defendant is charged by Complaint with conspiracy to possess with intent to distribute at least five (5) kilograms of cocaine in violation of Title 21, United States Code, Sections 841(b)(1)(A) and 846. Based upon these charges, there is a rebuttable presumption that defendant would pose a risk of flight and danger to the community if released. 18 U.S.C. §3142(e) and (f). Additionally, the government has represented that it intends to indict defendant

on additional charges, including a violation of Title 18, United States code, Section 924(c), which carries with it a mandatory consecutive term of five years' imprisonment. Thus, in addition to the current charges, which carry a minimum mandatory ten-year term of imprisonment, the new charges would subject defendant to a minimum mandatory fifteen-year term of imprisonment, if convicted. The government has further calculated defendant's anticipated Guidelines Sentencing range, should he be convicted, as falling between 188 months and 235 months' imprisonment. The defendant has not contested this estimate.

2. Title 18, United States Code, Section 3142(g)(2), requires the Court to consider the weight of the evidence against the defendant. Here, the weight of the evidence is substantial. The government has proffered the sworn testimony of Bureau of Alcohol, Tobacco, and Firearms Special Agent James Van Vliet that supports the allegations in the Complaint. Specifically, the government has substantial evidence that the defendant was a co-conspirator in a plan to commit a robbery at a "drug stash house" with the plan to steal approximately fifteen kilograms of cocaine and kill the armed guards at the residence, if necessary. The conspiracy involved the use of weapons, including (1) a loaded Ruger, Black Hawk Model, .357-caliber revolver; (2) a loaded RG, RG38S Model, .38-caliber revolver; (3) a loaded Star, P.A. Model, 9mm pistol; (4) a loaded Amadeo Rossi, .38-caliber revolver; (5) a Taurus Rossi, .38-caliber revolver; and (6) a Colt, Huntsman Model, .22-caliber pistol, all of which were recovered in the alleged co-conspirators' vehicles and the vicinity of the staging area for the robbery, an undercover warehouse. The defendant allegedly conspired with co-conspirators to rob the stash house and split the proceeds among the defendant, the co-conspirators, and the undercover agent.

A confidential informant as well as an undercover agent from Alcohol, Tobacco, and

Firearms, also implicated defendant and had roles in the plan.  Specifically, Alcohol, Tobacco and Firearms Special Agent Mike Connors ("Agent Connors") had his first contact with Caleb Glenn Williams, an alleged co-conspirator, in November of 2007, after a confidential informant introduced Agent Connors to Williams.

During a recorded meeting occurring on November 8, 2007, Agent Connors identified himself as a disgruntled narcotics courier for a Colombian narcotics organization, seeking to conduct an armed robbery to obtain cocaine.  Agent Connors explained that he routinely transported fifteen to twenty kilograms of cocaine, but he had not been compensated for his work as a courier.  Hence, he was seeking individuals who would conduct a robbery of a stash house used by the Colombian organization.  Agent Connors advised Williams that the stash house is always guarded by two individuals armed with handguns.  Williams responded, telling Agent Connors that he was interested in committing the robbery.  Williams elaborated, explaining that he had a group of four individuals, to whom he referred as "four shooters," who would execute the robbery.  In exchange for Agent Connors's involvement, Williams offer Agent Connors five kilograms of cocaine and further offered to sell the cocaine for Agent Connors.

During a recorded conversation that happened on November 10, 2007, Williams told Agent Connors that Williams had spoken to his crew, and they were "ready to handle business." Williams further advised Agent Connors that his crew wanted to meet Agent Connors.

On November 14, 2007, in a recorded conversation, Agent Connors met with Williams and an individual referred to as "Will," later identified as alleged co-conspirator Anthony Butler, at a Wal-Mart in Margate.  Williams explained to Agent Connors that butler was the leader of the crew that would conduct the robbery.  Williams further stated that Butler is a member of the

3

"Black Bandana Boys" criminal street gang, and they conduct robberies on a regular basis. After this introduction, Butler told Agent Connors that he would kill the armed guards at the stash house, if necessary. Williams and Butler then both stated that they would have to come up with a code to use with Agent Connors on the telephone so that they would know how many guards were inside the stash house at the time of the robbery. Finally, Williams explained that he also had another individual he intended to bring to watch his back and ensure that everything went alright.

On November 19, 2007, in a recorded conversation, Agent Connors met with Williams, Butler, and three others, later identified as Corey Edwards, Walter Roberts, and Madarrow Smith. Williams advised Agent Connors that Butler, Edwards, Roberts, and Smith were all members of the "Black Bandana Boys" criminal street gang, and that they conduct robberies regularly. Then Williams explained that with respect to the robbery on Agent Connors's organization's stash house, Williams would be the driver, armed with a firearm on the outside of the stash house, while the other four entered the residence to execute the robbery. All five individuals participated in conversation with Agent Connors, indicating that they were ready, willing, and able to execute the robbery. Additionally, they all indicated that they had the firearms necessary to commit the robbery. They also discussed a code that Agent Connors should use on the telephone to advise the others as to how many guards were in the stash house. Once again, Williams mentioned that he intended to bring another individual to watch Williams's back and ensure that everything went smoothly.

On November 28, 2007, Agent Connors met with Williams, Butler, Edwards, Roberts, Smith, and another individual later identified as the defendant at a gas station in Tamarac. The

six then entered a white Pontiac and a grey Toyota and followed Agent Connors to an undercover warehouse.  Upon noticing a roof-mounted surveillance camera at the warehouse, they decided to go inside the warehouse.  With Roberts waiting outside, the rest entered the warehouse.  When some of the alleged co-conspirators demanded to search Connors for a wire, Connors signaled law enforcement for a takedown.

During the course of the takedown, all six of the alleged co-conspirators, including defendant, attempted to flee.  A law enforcement officer stated that he saw defendant drop a loaded Amadeo Rossi, .38-caliber revolver in the process.  Agent Van Vliet testified that in reviewing the video recordings of the incident, he observed a bulge in defendant's clothing, consistent with having that type of weapon located within his clothes.  Additionally, law enforcement later recovered this weapon near the entrance of the warehouse where defendant and the others tried to flee.  Defendant was arrested in the warehouse parking lot area after entering the white Pontiac and attempting to drive away.  In a subsequent search of the various alleged co-conspirators and the cars in which they traveled, law enforcement recovered several pairs of latex gloves, a black "scully" cap, black caps, black gloves, a black long-sleeved shirt, black bandanas, and a role of duct tape.  More specifically, law enforcement recovered from the car in which Battle was arrested black caps, bandanas, a pair of gloves, and a role of duct tape.  Additionally, law enforcement found a blue ski mask in the warehouse area where Smith was arrested.  Law enforcement also found loaded revolvers on the front driver side and front passenger seat floor of the Pontiac, a loaded pistol on a trailer tire in the warehouse area where Smith was arrested, and a revolver and pistol on the driver side floor and the rear driver side seat, respectively, of the Toyota.

5

Law enforcement placed defendant and Roberts in the back of a law enforcement vehicle for transport.  While there, a device recorded defendant as saying words to the effect of the following: "I don't want to say I knew this was a set-up, but I had a bad feeling about it; and "That cracker Williams set us up."  Additionally, although not using these specific words, defendant indicated that he was suspicious because they went to a business to meet before the robbery.

Following his arrest, Williams waived his rights and answered questions.  Among other statements, Williams said that Battle was fully aware of and a participant in the robbery plans that day.

3. The pertinent history and characteristics of the defendant, of which Sections 3142(g)(3)(A) and (B) require a review, support pretrial detention.  Defendant was on bond in Broward County for possession of cocaine and burglary of a dwelling at the time that the instant offense occurred.

Defendant is a United States citizen, and a nearly lifelong resident of the Southern District of Florida.  He currently resides with his grandmother, his brother, and his aunt in Pompano Beach, and has for the past eighteen years.  The defendant represented that he and his girlfriend of the past year have one son, and defendant has another son from a previous relationship.  They all reside in the Pompano Beach area.  Defendant is a full-time student at Ely High School in Pompano Beach.

4.  Based on the seriousness of the alleged offenses, the anticipated use of loaded weapons in the course of executing the alleged conspiracy, and the amount of time in prison that defendant faces should he be convicted, as well as the outstanding state charges and the fact that

6

defendant is alleged to have committed the instant offense while on bond for the state charges, the undersigned believes that defendant would not appear if released on bond prior to trial and that defendant constitutes a danger to the community. 18 U.S.C. §3142(g)(3) and (4). The Court finds that defendant has failed to rebut the presumption that he would pose a risk of flight. The Court further finds that defendant has failed to rebut the presumption that he poses a danger to the community. Moreover, even not considering the presumption, the Court finds, based on clear and convincing evidence, that the defendant would pose a danger to the safety of other persons and the community. Therefore, the Court specifically finds that there are no conditions or combination of conditions which reasonably will assure defendant's appearance as required and/or the safety of any other person and the community. 18 U.S.C. § 3142(e).

     5.  Accordingly, the Court hereby directs:

       (a)  That defendant be detained without bond and be committed to the custody of the Attorney General for confinement in a corrections facility separate, to the extent practical, from persons awaiting or serving sentences or being held in custody pending appeal;

       (b)  That defendant be afforded reasonable opportunity for private consultation with counsel; and

       (c)  That, on order of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility in which defendant is confined deliver the defendant to a United States Marshal for the purpose of an appearance in

connection with a court proceeding.

**DONE AND ORDERED** at Fort Lauderdale, Florida, this 28th day of December, 2007.

ROBIN S. ROSENBAUM
United States Magistrate Judge

Copies to:

Michael Cohen Esq.
Scott Behnke, AUSA
Pretrial Services (FTL)